UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

--------------------------------------------------------------
                                 )
United States of America,        )  File No. 16-CR-002
                                 )          (KES/VLD)
         Plaintiff,              )
                                 )
vs.                              )  Minneapolis, Minnesota
                                 )  December 16, 2015
Khaalid Adam Abdulkadir,         )  3:00 p.m.
                                 )
         Defendant.              )
                                 )
--------------------------------------------------------------

BEFORE THE HONORABLE FRANKLIN L. NOEL
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(PRELIMINARY AND DETENTION HEARING)**


<u>APPEARANCES</u>
 For the Plaintiff:          U.S. Attorney's Office
                             JOHN DOCHERTY, AUSA
                             600 U.S. Courthouse
                             300 South Fourth Street
                             Minneapolis, Minnesota 55415

 For the Defendant:          Robins, Kaplan, LLP
                             CHRISTOPHER W. MADEL, ESQ.
                             AARON R. THOM, ESQ.
                             2800 LaSalle Plaza
                             800 LaSalle Avenue
                             Minneapolis, Minnesota 55402

 Court Reporter:             LORI A. SIMPSON, RMR-CRR
                             1005 U.S. Courthouse
                             300 South Fourth Street
                             Minneapolis, Minnesota 55415



     Proceedings recorded by mechanical stenography;
transcript produced by computer.

1
<u>**I N D E X**</u>

2                                                                    PAGE

VADYM VINETSKY
     Direct Examination by Mr. Docherty              14
3    Voir Dire Examination by Mr. Madel              21
     Resumed Direct Examination by Mr. Docherty      22
4    Cross Examination by Mr. Madel                  29
     Redirect Examination by Mr. Docherty            46
5    Recross Examination by Mr. Madel                52

6

7

GOVERNMENT EXHIBITS                                  REC'D
8     1                                               21
      2                                               26
9

10   DEFENSE EXHIBITS                                 REC'D
      1                                               40
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                  **IN OPEN COURT**

3       (Defendant present)

4              THE COURT:  Okay.  This is the United States vs.

5       Khaalid Adam Abdulkadir.  And I apologize if I have

6       mispronounced your name.  Am I anywhere close, Mr. Madel?

7              MR. MADEL:  You are, Your Honor.  You are

8       surprisingly close.

9              THE COURT:  Let's get everybody's appearance on

10      the record.  For the government?

11             MR. DOCHERTY:  Good afternoon, Your Honor.

12      Assistant U.S. Attorney John Docherty appearing for the

13      United States.  Also at counsel table is Special Agent Vadym

14      Vinetsky from the Federal Bureau of Investigation.

15             THE COURT:  Okay.

16             MR. MADEL:  Good afternoon, Your Honor.  Chris

17      Madel and Aaron Thom for the defendant, who is present.

18             THE COURT:  Okay.  So we're here for a preliminary

19      and detention hearing, correct?

20             MR. DOCHERTY:  Correct, Your Honor, that's my

21      understanding.

22             THE COURT:  Mr. Docherty, you're up.

23             MR. DOCHERTY:  Your Honor, we are here for a

24      preliminary and a detention hearing today.  My

25      understanding, though, is that the defense has certain

1    argument that they may wish to make at this time.

2              THE COURT:  Okay.  Mr. Madel.

3              MR. MADEL:  Thank you, Your Honor.  Yes, the first

4    is the issue that I previewed in my e-mail to Your Honor.

5              I first got assigned to this matter yesterday and

6    it's my understanding on December 14th Chief Judge Riley

7    assigned this matter to a United States District Court judge

8    for the District of South Dakota, Karen E. Schreier, for all

9    proceedings with respect to this matter.

10             One of the allegations in this case is that my

11   client has threatened at least the FBI as well as a federal

12   judge in this district.  I believe that Chief Judge Riley's

13   order requiring -- or stating another judge should be here

14   is essentially saying recusal of this district with respect

15   to all proceedings in this case.

16             So that's why I stated in my e-mail that we would

17   respectfully request and we will move for all judges in the

18   District of Minnesota to be recused from this case and that

19   all proceedings be under Judge Schreier.

20             Alternatively with respect to that, our other

21   request -- we're fine if Your Honor denies that and wants to

22   go forward today.  What we would propose is that we would go

23   forward with the probable cause hearing, but we would ask

24   under 3142(f)(2) a continuance with respect to the detention

25   hearing.

1        We've learned of a number of witnesses for my

2   client that I think are relevant to that and I think if you

3   read probation's report with respect to this matter, this

4   is -- even in Category III, over 50 percent of those clients

5   appear even according to probation's statistics.  I think we

6   would argue that this is not a Category III case, but we

7   need to get those witnesses to the hearing.  And we would

8   also request discovery under Rule 26(2).

9        THE COURT:  Okay.  Mr. Docherty, do you have any

10   position on either of those requests?

11        MR. DOCHERTY:  Yes, Your Honor, I have something

12   briefly to say on both of them.

13        First of all as to recusal, I do not read Chief

14   Judge Riley's order in any way like Mr. Madel does.  It

15   simply assigns Judge Schreier to preside over this case.

16   28 U.S.C. 455, the recusal statute, says -- the standard is

17   general.  It states that a judge should recuse himself when

18   his impartiality could reasonably be questioned.

19        The tweets in this matter, which are an attachment

20   to the complaint, talk about -- do not name a judge in this

21   district.  However, there is one judge who is presiding over

22   ISIL cases and before that al-Shabaab cases in this district

23   and so that, it would seem to me, is the victim of this

24   alleged crime and that would not be all of the judges in

25   this district.

1          With respect to a continuance, Your Honor, if

2     Mr. Madel is saying that he needs more time to prepare, we

3     are not going to stand in the way of that.  However, we do

4     oppose the proposal to separate detention and probable

5     cause.

6          This is a case involving threats, therefore the

7     evidence concerning probable cause is very much intertwined

8     with the evidence of risk of harm to the community.  It

9     would be -- if we are going to present that evidence, we

10    should present it once and not twice.

11         So as I say, I'm not going to get in the way of a

12    defense attorney who says that additional time is needed in

13    order to properly represent his client, but I do say that we

14    should not proceed with anything today if that is the

15    decision, is to have a continuance.  We should continue the

16    whole thing.

17         Thank you.

18         THE COURT:  Okay.  Here's what we're going to

19    do -- anything else, Mr. Madel, you want to say in response

20    to that?

21         MR. MADEL:  Yes, I do.  Thank you, Your Honor.

22    Risk of harm to the community is not a factor under 3142.

23    The standard here is whether or not there's a serious risk

24    that such person will flee or a serious risk that such

25    person will obstruct or attempt to obstruct justice,

1    threaten, injure, or intimidate a prospective witness or

2    juror.

3            I will also reserve argument with respect to

4    whether or not there was one federal judge that presided

5    over the ISIS case.  There were several federal judges that

6    presided over the ISIS case, Your Honor I believe being one

7    of them that has done that from time to time, and I think

8    that the record there speaks for itself.

9            THE COURT:  Hold on.  I'm flummoxed by your

10   contention that 3142 doesn't have a risk to the community

11   factor.  So as I understand it --

12           MR. MADEL:  I am reading -- Your Honor, I can

13   point you to what I was reading, 3142(f) sub 2.  Unless the

14   government is contending that this is a crime of violence,

15   which we will brief, then you have to go under sub (2)

16   where it says, "Upon motion of the attorney for the

17   government...involves (A) a serious risk that such person

18   will flee; or (B) a serious risk that such person will

19   obstruct or attempt to obstruct justice," et cetera.

20           THE COURT:  So where does, from your perspective,

21   the 3142(e) come in that we can order detention?  "If, after

22   a hearing pursuant to the provisions of subsection (f)...,

23   the judicial officer finds that no condition or combination

24   of conditions will reasonably assure the appearance of the

25   person as required and the safety of any other person and

1    the community, such judicial officer shall order the

2    detention of the person before trial."

3            MR. MADEL:  Upon (1) or (2).  It says, "(1) upon

4    motion of the attorney for the government in a case that

5    involves," and then there's (A) through (E).  And then

6    there's sub (2), "Upon motion...for the government or upon

7    the judicial officer's own motion in a case that involves,"

8    and then there's subsection (A) and (B) that I just spoke

9    of.  Unless the government satisfies those, you don't get to

10   the factors with respect to danger to the community,

11   et cetera.

12           And my point is that just to come into court and

13   say that this defendant for whatever reason is a danger to

14   the community -- for example, if he was charged with some

15   sort of a misdemeanor violation on some federal land, you

16   can't come in under (1) or (2) and get a danger to the

17   community because you still have to satisfy subsections (1)

18   and (2) before you get to those factors.

19           THE COURT:  And what is meant by the phrase or the

20   word "involves"?  In other words, does the government have

21   to actually make a showing of that before they even get the

22   hearing or it has to involve it, meaning they allege it?

23           MR. MADEL:  Well, here's where I think the

24   government and I would respectfully disagree.  Involves a

25   crime of violence and a threat of violence, I think under

1    the case law, you know, there's a split with respect to

2    whether or not threats can constitute that and you have to

3    make a determination as to whether it's a real cognizable

4    threat with respect to whether it could be carried out and

5    whether or not the defendant has the means, the wherewithal,

6    was intending, was preparing, that sort of thing.  That

7    would go into whether or not that is a crime of violence.  I

8    would respectfully submit to Your Honor that it's not.

9           And I think that under the circumstances

10   particularly of this case it's not, especially when you talk

11   about for which a maximum term of imprisonment of ten years

12   or more is prescribed.

13          THE COURT:  Okay.  Mr. Docherty, any comments on

14   whether --

15          MR. DOCHERTY:  Yes, Your Honor, I have something

16   to say about that.  Your Honor, I think first of all we need

17   to take the statute as a whole and not as individual parts.

18          3142(e), as the Court has pointed out, says that,

19   "If, after a hearing pursuant to the provisions of

20   subsection (f)..., the judicial officer finds that no

21   condition or combination of conditions will reasonably

22   assure the appearance of the person as required and the

23   safety of any other person and the community, such judicial

24   officer shall order the detention..."

25          Going over to subpart (f), it begins -- before the

1    split or dichotomy that Mr. Madel has spoken quite a bit

2    about, the very opening of 3142(f) is similar to 3142(e).

3    "The judicial officer shall hold a hearing to determine

4    whether any condition or combination of conditions set forth

5    in subsection (c) of this section will reasonably assure the

6    appearance of such person as required and the safety of any

7    other person and the community."  Even if we accept

8    Mr. Madel's reliance upon the dichotomy that follows,

9    there's these two statements of the very familiar standard

10    about danger to the community.

11         Yes, this certainly is a case that involves

12    violence.  It is a case that involves threats of violence

13    and it is, as the affidavit of Special Agent Vinetsky in

14    support of the complaint points out, bound up with

15    allegations of international terrorism.  So, yes, it

16    involves a crime of violence.

17         And number two, we shouldn't even really need to

18    get there in terms of deciding what the applicable standard

19    is because by the time we get to this dichotomy, the

20    familiar standard that we all use in most of these detention

21    hearings has been stated by the statute two times.

22         THE COURT:  Right, but it does limit the kinds of

23    cases in which you get to even have the hearing and I guess

24    my question is:  And maybe you've just answered it.  It's

25    your contention that this is a crime of violence; is that

1    correct?

2              MR. DOCHERTY:  Yes, it is.  It involves a crime of

3    violence.

4              THE COURT:  Okay.  And is it also your contention

5    or how do I read -- I'm reading now in (f)(1)(A), "A crime

6    of violence, a violation of Section 1591, or an offense

7    listed in Section 2332b(g)(5)(B) for which a maximum term of

8    imprisonment of ten years or more is prescribed."

9              That ten years or more only refers to the 2332

10   cases or any of these crimes of violence or 1591 as well?

11             MR. DOCHERTY:  I would say that I don't know the

12   answer to that, but I would also say that it does not matter

13   because the crime charged in this case -- and I will just

14   turn to it so that I get it exactly right.

15             MR. MADEL:  It's ten years or more.

16             MR. DOCHERTY:  It's ten years.

17             THE COURT:  Okay.  Have I heard everybody on the

18   question of whether we're even going to have a detention

19   hearing?

20             MR. DOCHERTY:  Well, if there are unanswered

21   questions, I want to address them, but otherwise I've said

22   what I want to say.

23             THE COURT:  Okay.  Mr. Madel?

24             MR. MADEL:  And, again, Your Honor, we would

25   request a continuance of the detention hearing.  We would

1    like to go forward with the probable cause hearing.  I would

2    respectfully disagree with respect to whether or not these

3    matters are so intertwined that you can't hear one without

4    the other.

5         I would submit, based upon the ruling that we got

6    in the United States vs. Said case, that the probable cause

7    here is nonexistent, especially under one of the arguments

8    that was just made with respect to that Statute 115.  So I

9    don't think -- I think if you hear this testimony, I don't

10   think fairly under 115 there has been a 115 violation

11   charged that's been stated here.

12        THE COURT:  All right.  So it appears to me that

13   the government is entitled to a detention hearing under 3142

14   inasmuch as it appears to me that in light of the

15   government's description of the charges, that this does

16   involve a crime of violence and whether it has to be a crime

17   of violence that has a penalty of a maximum of ten years or

18   more or not is immaterial since this one does.  So we're

19   going forward with the detention hearing.

20        But first with regard to defendant's request to

21   continue, that request is at this moment denied.  We're

22   going forward with the preliminary hearing, at the

23   conclusion of which -- I take it you just have one witness,

24   Mr. Docherty, on the --

25        MR. DOCHERTY:  Correct, Your Honor.

1        THE COURT:  And then I have also before me two

2    reports from the Probation and Pretrial Services Office.

3    One is dated December the 11th and the other is dated

4    December 15th.  Does everybody have those?

5        MR. DOCHERTY:  The government does, Your Honor.

6        MR. MADEL:  Yes, Your Honor, we have them.

7        THE COURT:  All right.  And other than the witness

8    on the preliminary hearing, does the government have any

9    other witnesses on detention?

10        MR. DOCHERTY:  No, Your Honor.  As I said, the two

11    are going to be presented simultaneously.

12        THE COURT:  Once we're completed with the

13    testimony on the preliminary hearing, if I conclude that

14    there is probable cause, then I will listen to you again,

15    Mr. Madel, to tell me exactly what it is you want to present

16    that you can't do today and then we'll find a date and time

17    for you to do that.

18        MR. MADEL:  Sounds good, Your Honor.  Thank you.

19        THE COURT:  All right.  With that -- but we're not

20    closing the record in any way.  So I will consider

21    everything that I am hearing today and whatever you present

22    on the ultimate issue if that becomes the issue.

23        MR. MADEL:  Understood, Your Honor.  Thank you.

24        THE COURT:  Mr. Docherty, call your witness.

25        MR. DOCHERTY:  Your Honor, the United States calls

1    Vadym Vinetsky.

2              THE COURT:  Mr. Vinetsky, do you want to come

3    forward and get sworn in, please, sir.  Raise your right

4    hand.

5         (Witness sworn.)

6              THE COURT:  Have a seat.  State your name and

7    spell your last name for the court reporter, please.

8    Actually, spell both your first and last name for the court

9    reporter, please.

10             THE WITNESS:  Sure.  My name is Vadym Vinetsky.

11   Vadym, that's V-a-d-y-m.  Vinetsky, V-i-n-e-t-s-k-y.

12                        **(Vadym Vinetsky)**

13                        **DIRECT EXAMINATION**

14   BY MR. DOCHERTY:

15   Q.  Good afternoon, Mr. Vinetsky.  Could you tell His Honor,

16   please, where you work and what you do there.

17   A.  Your Honor, I am a special agent with the FBI.  I've

18   been employed by the FBI since February of 2010.  From

19   February 2010 until June of 2014 I was an intelligence

20   analyst within the FBI.  From June 2014 until currently I'm

21   a special agent assigned to the FBI in the Minneapolis field

22   office.

23   Q.  And are you assigned to any particular squad within the

24   Minneapolis field office?

25   A.  Your Honor, I'm assigned to the Joint Terrorism Task

1    Force, the JTTF.

2    Q.  What sorts of cases do they work on?

3    A.  They investigate criminal violations related to

4    terrorism activity.

5    Q.  Have you been involved professionally in the case that

6    has us in court today here, United States vs. Khaalid

7    Abdulkadir?

8    A.  Yes, sir.

9    Q.  Could you summarize, please, what it is that you have

10   done in that case.

11   A.  I've reviewed the case file, I have spoken to other

12   fellow agents, and I authored the affidavit for the

13   complaint.

14   Q.  So you actually went before the magistrate and swore out

15   the complaint?

16   A.  I did.

17   Q.  Now, before we start on the facts of this particular

18   case, just by way of some background, are you familiar with

19   a social network called Twitter?

20   A.  I am.

21   Q.  And tweets?

22   A.  Yes.

23   Q.  Okay.  And retweeting?

24   A.  Yes.

25   Q.  Let's take those up in turn.  What's Twitter?

1    A.   Twitter is a social networking application that can be

2    used on various devices: cell phones, tablets, webtalks,

3    computers.

4    Q.   And what sorts of -- these tweets that are sent on

5    Twitter, what are the tweets?

6    A.   Tweets are short messages, about 140 characters in

7    length.

8    Q.   And then lastly, what does it mean to retweet something?

9    A.   I interpret a tweet as a post.  To retweet something is

10   to repost that information.

11   Q.   All right.  So to take someone else's tweet and push it

12   on further down?

13   A.   Yes.

14   Q.   Agent Vinetsky, I want now to direct your attention to

15   Wednesday of last week.  That would be December the 9th.

16   Was there an arrest in a terrorism case here in Minneapolis

17   that day?

18   A.   Yes.

19   Q.   Who was it who got arrested on December the 9th?

20   A.   Mr. Abdirizak Warsame was arrested on December 9th.

21   Q.   And do you remember what the allegations were, in a

22   sentence, against Mr. Warsame, what he was arrested for?

23   A.   Conspiracy to provide material support to ISIL.

24   Q.   And just for the record, what is ISIL?

25   A.   ISIL is a designated foreign terrorist organization.

1    Q.  About what time of day was Mr. Warsame taken into

2    custody?

3    A.  Approximately 7:00 p.m. Central Time.

4    Q.  And following that arrest, were there some tweets that

5    were posted?

6    A.  Yes.

7    Q.  And you know the tweets that we're talking about, the

8    ones in this case?

9    A.  I do.

10   Q.  Okay.  In which Twitter account were those tweets

11   posted?  Do you remember the name of it?

12   A.  I do.

13   Q.  Could you tell us, please.

14   A.  It was @kabdulkadir14.

15   Q.  And tweets can be public or private; is that accurate?

16   A.  Yes.

17   Q.  They can be.  And these tweets, were they public or were

18   they private?

19   A.  These were public tweets.

20   Q.  So no search warrant or anything like that needed to be

21   used to get at them; is that accurate?

22   A.  That's accurate.

23   Q.  Did law enforcement obtain a screen shot of those

24   tweets?

25   A.  Yes.

1    Q.  Can you summarize for us how it was that law enforcement

2    got that screen shot.

3    A.  Through our confidential informant.

4    Q.  And can you elaborate on that.  The confidential

5    informant, what, saw the tweets or something and what

6    happened next?

7    A.  Sure.  I learned about the tweets Thursday morning by

8    talking to a fellow agent.  He made me aware that a

9    confidential informant was on Twitter on Wednesday evening

10   and was able to capture the two threatening tweets and then

11   the agent documented that in a report.

12   Q.  And before that had there also been tweets on this

13   Twitter account?

14   A.  Yes.

15   Q.  All right.  And this was @kabdulkadir14; is that

16   correct?

17   A.  Yes.

18   Q.  Is there a photograph on that next to those tweets?

19   A.  Yes.

20   Q.  Are you familiar -- I mean, before this hearing today

21   are you familiar with the appearance of Mr. Abdulkadir?

22   A.  I was familiar.

23   Q.  How did you obtain that familiarity?

24   A.  His driver's license photo.

25   Q.  When you look at the photograph next to these tweets and

1    his driver's license photo, who do you conclude the

2    photograph on the Twitter feed is?

3    A.   Khaalid Abdulkadir.

4    Q.   Later on that evening after the tweets in question, was

5    there a tweet that involved a telephone number?

6    A.   There was a tweet involving a telephone number.

7    Q.   And did that also come from @kabdulkadir14?

8    A.   Yes.

9    Q.   And can you summarize, please, what was that tweet that

10   involved the telephone number.  What did it say?  I know you

11   probably can't quote it, but.

12   A.   Sure.  In summary it was DM, which stands for direct

13   message, or call me on a particular number.

14   Q.   And that particular number, you're not saying it out

15   loud, but it was a telephone number?

16   A.   Yes.

17   Q.   Was it a telephone number known to the FBI?

18   A.   Yes.

19   Q.   How is it known to the FBI?  How did the FBI learn about

20   this number?

21   A.   The FBI reviewed a subpoena return from Facebook and

22   that number was associated with Khaalid Abdulkadir.

23   Q.   So this was a subpoena for Mr. Abdulkadir's Facebook?

24   A.   Yes.

25   Q.   And on the Facebook -- is it a profile page?  Am I using

1    the right term?  Is there a profile page on a Facebook

2    account?

3    A.  Yes.

4    Q.  And on that profile page are there things about the

5    person, such as where they live and phone numbers and

6    e-mails and things like that?

7    A.  Typically, yes.

8    Q.  And is that where this phone number was?

9    A.  No.

10   Q.  Okay.  Where was this phone number?

11   A.  This is the phone number that appeared in the subpoena

12   return.

13   Q.  Okay.  Thank you.  And that was sent to Facebook?

14   A.  Yes.

15   Q.  The subpoena, I mean, was sent to Facebook.

16          MR. DOCHERTY:  If I could approach, Your Honor?

17          THE COURT:  Sure.

18   BY MR. DOCHERTY:

19   Q.  Agent Vinetsky, I just handed you a single piece of

20   paper.  Does that appear to you to be the screen shot that

21   you've been testifying about for the last few minutes?

22   A.  Yes.

23   Q.  Is that an accurate copy of that screen shot?

24   A.  Yes, it is.

25          MR. DOCHERTY:  Your Honor, move the admission of

1    Exhibit -- Government's Exhibit Number 1 for purposes of

2    this hearing.

3              THE COURT:  Any objection?

4              MR. MADEL:  May I voir dire, Your Honor?

5              THE COURT:  Sure.

6                   **VOIR DIRE EXAMINATION**

7    BY MR. MADEL:

8    Q.  Who gave you this?

9    A.  John Docherty.

10   Q.  The screen shot was given to you by AUSA John Docherty?

11   A.  I mean, how did we originally obtain this?

12   Q.  Yes.

13   A.  Confidential informant.

14   Q.  Who?

15             MR. DOCHERTY:  Objection, Your Honor.

16             THE COURT:  Sustained.

17             MR. MADEL:  Then, Your Honor, I object.  It's not

18   authentic.  I mean, how do we know that this was actually

19   this Twitter page?  These were deleted tweets.  So how do we

20   possibly know that this wasn't created by the confidential

21   source if I don't even know who it is?

22             THE COURT:  Okay.  The objection is overruled.  As

23   I understand the testimony, this witness has testified that

24   the document that Mr. Docherty just handed him is an

25   accurate copy of tweets that were given to this witness by a

1    confidential informant.  Have I correctly stated --

2              MR. DOCHERTY:  Yes, Your Honor, and then there was

3    other testimony regarding attributing this particular

4    Twitter account to this particular defendant, such as the

5    phone number and some other things I'll get to in a minute.

6              THE COURT:  Okay.  Next question.

7                    **RESUMED DIRECT EXAMINATION**

8    BY MR. DOCHERTY:

9    Q.  Agent Vinetsky, do you see on this Government's

10   Exhibit 1, which is now up on the screen, do you see a name

11   up at the top in boldface?

12   A.  I do.

13   Q.  And what name is that?

14   A.  Khalid Abdulkadir.

15   Q.  And, again, whose photograph is to the left?

16   A.  Khaalid Abdulkadir.

17   Q.  Now, also across the top it says, "Montana From OeO

18   Retweeted."  Do you see that?

19   A.  I do.

20   Q.  What does that mean in Twitter?

21   A.  He reposted the message.

22   Q.  So someone named Montana From OeO has reposted this

23   message already; is that correct?

24   A.  This tweet, yes.

25   Q.  And to your understanding, is there a limit to the

1    number of times that a particular message can be retweeted?

2    A.  Not that I'm aware of.

3    Q.  I want to direct your attention further back.  We've

4    been talking about December the 9th of last week really, but

5    further back than that, back in May were there -- do you

6    know a man named Abdi Nur?

7    A.  Yes.

8    Q.  Who is Abdi Nur?

9    A.  Abdi Nur is a young man from Minnesota that traveled to

10   Syria and joined ISIS or ISIL.

11   Q.  And once he reached Syria and joined ISIL, did Abdi Nur

12   reach back into Minnesota and communicate with people here?

13   A.  Yes.

14   Q.  Did the defendant, Khaalid Abdulkadir, attempt to

15   communicate with Abdi Nur?

16   A.  Yes.

17   Q.  When you say that, how is it that you know that this

18   defendant tried to communicate with Abdi Nur?

19   A.  Because of Facebook.

20   Q.  And on that Facebook -- and this is the Facebook that

21   you talked about sending a subpoena in on; is that correct?

22   A.  Yes.

23   Q.  The same account?

24   A.  Yes.

25   Q.  Were there communications -- attempted communications

1    from Mr. Khaalid Abdulkadir to Abdi Nur?

2    A.  Yes.

3    Q.  Can you identify or describe for the Court, please, sort

4    of the sum and substance of those communications.

5    A.  Yes.  Abdulkadir and two other identified individuals

6    were ready to travel and they were seeking guidance from

7    Abdi Nur.

8    Q.  Did Abdi Nur reply as far as you or the FBI generally is

9    aware?

10   A.  Not to my knowledge.

11   Q.  Now, also at about this same time frame, on the 9th of

12   May was there a court appearance in this building concerning

13   a different terrorism case?

14   A.  Yes.

15   Q.  And was this a case involving some arrests that had been

16   made earlier, on the 19th of April?

17   A.  Yes.

18   Q.  Can you tell us how many people were arrested on the

19   19th of April.

20   A.  Six people.

21   Q.  How many were arrested here in Minnesota?

22   A.  Four were arrested in Minnesota and two were arrested in

23   San Diego, California.

24   Q.  And on May the 9th was one of those defendants having a

25   court appearance?

1    A.   Yes.

2    Q.   Was Mr. Abdulkadir in attendance at that hearing?

3    A.   Yes.

4    Q.   Following that hearing was there some interaction

5    between Mr. Khaalid Abdulkadir, the defendant here today,

6    and a deputy United States marshal?

7    A.   Yes.

8    Q.   Could you describe for His Honor, please, what that

9    interaction was like.

10   A.   The deputy U.S. marshal approached Abdulkadir and

11   requested to interview him on an unrelated matter.

12   Abdulkadir refused to interview.  Later that day the

13   U.S. marshal went downstairs to the café on the ground floor

14   level of this building.  He sat next to the window.  The

15   window was about floor to ceiling in size overlooking the

16   plaza of the federal courthouse.

17              Abdulkadir and other unidentified males were

18   outside on the plaza.  They noticed the U.S. marshal sitting

19   in the café through the window, approached the U.S. marshal,

20   took out their phones, and it appeared that they were

21   filming or taking pictures of the marshal.

22   Q.   And when that happened --

23              THE COURT:  Let me interrupt if I can.  Through

24   the window or they were in the cafeteria with them?

25              THE WITNESS:  Through the window, Your Honor.

1    BY MR. DOCHERTY:

2    Q.  How did the U.S. marshal -- or the deputy U.S. marshal,

3    excuse me, react to this?

4    A.  He took out his phone and took a picture of the

5    individuals taking his picture.

6    Q.  And have you seen that picture?

7    A.  I have.

8              MR. DOCHERTY:  If I could approach, Your Honor?

9              THE COURT:  Sure.

10   BY MR. DOCHERTY:

11   Q.  Agent Vinetsky, I have just handed you a single piece of

12   paper.  Is that the photograph that was taken by the deputy

13   U.S. marshal?

14   A.  Yes.

15   Q.  Is that an accurate reproduction of that photograph?

16   A.  Yes.

17             MR. DOCHERTY:  Offer Exhibit 2 for purposes of

18   today's hearing, Your Honor.

19             THE COURT:  Any objection?

20             MR. MADEL:  None.

21             THE COURT:  Okay.  Exhibit 2 will be received.

22   BY MR. DOCHERTY:

23   Q.  Looking here at Exhibit Number 2, do you recognize the

24   building in the background, Agent Vinetsky?

25   A.  Yes.

1    Q.  Okay.  And does that help you know that this is on the

2    plaza in front of this building?

3    A.  Yes.

4    Q.  Is the defendant, Khaalid Abdulkadir, in this

5    photograph?

6    A.  Yes.

7    Q.  And whereabouts in -- there's three people in the

8    photograph.  Can you tell us which one he is, please.

9    A.  Yes.  He's in the center.

10   Q.  Agent Vinetsky, going even farther back, back to January

11   of this year, are you familiar with a federal fugitive by

12   the name of Mohamed Abdullahi Hassan?

13   A.  Yes.

14   Q.  Does Mohamed Abdullahi Hassan have a nickname that he

15   uses?

16   A.  Yes.

17   Q.  What does he go by?

18   A.  Miski.

19   Q.  And can you tell us -- just as you did for Abdi Nur,

20   could you please tell us who Mohamed Abdullahi Hassan, a/k/a

21   Miski, is.

22   A.  He's also a young male from Minnesota that left to

23   Somalia in 2008 and joined al-Shabaab.

24   Q.  And when you say left Minnesota --

25   A.  Yes, left Minnesota for Somalia.

1    Q.  And went to Somalia?

2    A.  Yes.

3    Q.  Has he been in Somalia continuously?

4    A.  I don't know.

5    Q.  Okay.  But has he -- well, what's he been doing in

6    Somalia?

7    A.  He was part of al-Shabaab.

8    Q.  And what's al-Shabaab?

9    A.  It's a designated foreign terrorist organization.

10   Q.  Has Miski, Mohamed Abdullahi Hassan, reached back into

11   Minnesota and communicated with people who are still here?

12   A.  Yes.

13   Q.  In January of 2015 did he communicate with the defendant

14   in this case, Khaalid Abdulkadir?

15   A.  Yes.

16   Q.  And what medium did the two men use to communicate with

17   each other?

18   A.  Twitter.

19   Q.  Can you summarize for us, please, what those Twitter

20   messages between Miski and the defendant were about.

21   A.  Abdulkadir wrote to Miski saying that he wanted to get

22   to Sham and he asked Miski for guidance on how to get there.

23   Q.  When you say, "Sham," what does that term mean?

24   A.  Syria.

25   Q.  And in response to this request for guidance on how to

1    get to Sham, did Miski reply?

2    A.  Yes.

3    Q.  Could you tell us, again, in substance, what it was that

4    Miski said in reply to this request from Abdulkadir.

5    A.  In summary it was get to Turkey first and then --

6    Q.  And did he indicate that assistance would be available

7    in Turkey?

8    A.  Yes.

9           MR. DOCHERTY:  That's all the questions I have on

10   direct, Your Honor.  Thank you.

11          THE COURT:  Okay.  Mr. Madel.

12          MR. MADEL:  Thank you, Your Honor.

13                     **CROSS EXAMINATION**

14   BY MR. MADEL:

15   Q.  Agent -- it's Vinetsky, right?

16   A.  Yes.

17   Q.  I want to make sure I get that right.  Everybody

18   butchers my last name too.

19          Are you the lead FBI agent with respect to the

20   investigation of the defendant in this case?

21   A.  I am not.

22   Q.  Who is?

23   A.  Task Force Officer Timothy Gregg.

24   Q.  And so you've been tasked with collecting facts together

25   from the other agents working on this in order to do an

1   affidavit supporting the criminal complaint and the arrest

2   warrant, right?

3   A.  Sure.

4   Q.  Now, if I understand this right, you say that

5   Mr. Abdulkadir made two tweets that constituted legal

6   threats to federal officers on December 9, 2015; is that

7   right?

8   A.  Yes.

9   Q.  And you would agree with me that in those tweets there's

10  no specific federal officer that's identified, right?

11  A.  Yes.

12  Q.  There's no federal agent that's identified, right?

13  A.  Right.

14  Q.  There's no specific judge that's identified?

15  A.  Correct.

16  Q.  And you can't tell the Court which specific individual

17  or individuals making the tweets intended to threaten; is

18  that right?

19  A.  Can you repeat the question?

20  Q.  Sure.  Can you tell Magistrate Judge Noel today what

21  specific person that you say that Mr. Abdulkadir intended to

22  threaten through those tweets?

23  A.  FBI agents and the judge.

24  Q.  But can you give the judge a name of any of those

25  people?

1    A.  I cannot.

2    Q.  And has Mr. Abdulkadir ever communicated to you in any

3    manner that he was responsible or wrote any of these tweets?

4    A.  I have not spoken to Abdulkadir.

5    Q.  Has anybody from the FBI told you that Mr. Abdulkadir

6    said he was responsible, he wrote or he sent any -- either

7    one of those tweets?

8    A.  No.

9    Q.  And you've asked, right?

10   A.  Asked who?

11   Q.  You've asked people that were on the SWAT team and with

12   the FBI at the time of the arrest if he admitted to sending

13   the tweets, right?

14   A.  Yes.

15   Q.  And they said, no, he didn't say anything, right?

16   A.  Well, he was very verbally aggressive, but he did not

17   admit to tweeting that.

18   Q.  In fact, he denied it?

19   A.  I don't know about that.

20   Q.  You've seen this 302, right, the statement?

21   A.  Who authored the 302, sir?

22   Q.  Sure.  It appears to be by Carson D. Green dated

23   December 14, 2015.  Have you read it?

24   A.  Yes, I have.

25   Q.  And do you recall him stating -- I'll find it here.

1    "Agents then advised Abdulkadir of the reason for his

2    arrest, whereupon Abdulkadir emphatically denied threatening

3    anyone."  Do you recall reading that?

4    A.  I don't recall reading that.

5    Q.  Did you ever talk to Mr. Green about how Mr. Abdulkadir

6    emphatically denied threatening anyone?

7    A.  No, I have not.

8    Q.  So this is the first time you're learning about that?

9    A.  I have read that document, but I don't recall seeing

10   that information.

11   Q.  Okay.  Do you want to read it again?

12   A.  If you would like me to, I can.

13   Q.  Sure.

14          MR. MADEL:  May I approach, Your Honor?

15          THE COURT:  Sure.

16   BY MR. MADEL:

17   Q.  The portion that I was just talking about is right there

18   (indicating).

19      (Pause.)

20   A.  Okay.

21   Q.  Does that refresh your recollection that you learned as

22   part of your investigation with respect to this case that

23   Mr. Abdulkadir told government agents he emphatically denied

24   making any of these threats?

25   A.  If that's what it says in this document, then that's

1    correct.

2    Q.  So what have you done to investigate the Internet

3    protocol address for any of these tweets?

4    A.  I don't know.

5    Q.  Do you know if anybody from the FBI has investigated --

6    whether or not they looked at the Internet protocol address

7    for any of these tweets and tried to trace it back to

8    Mr. Abdulkadir?

9    A.  I don't know that information, sir.

10   Q.  Do you have his phone?

11   A.  Can you repeat that question?

12   Q.  Sure.  Does the government -- is the government in the

13   possession of Mr. Abdulkadir's telephone?

14   A.  Yes.  It was seized.

15   Q.  Have you searched that?

16   A.  I don't know.

17   Q.  Do you know how many people know Mr. Abdulkadir's

18   password for Twitter?

19   A.  No, I don't.

20   Q.  Do you know what his password is?

21   A.  I do not.

22   Q.  So am I correct, then, that your sole basis for linking

23   Mr. Abdulkadir to these tweets is that picture of him next

24   to the tweets?

25   A.  There were other tweets that were very critical of law

1    enforcement, FBI and police, as well.

2    Q.  I understand.

3    A.  Coupled with a phone number that was also posted.

4    Q.  And was the phone number posted on Twitter?

5    A.  Yes.

6    Q.  And where was it posted on Twitter?

7    A.  It was on his Twitter page.

8    Q.  And do you have a copy of that that you can show the

9    Court?

10   A.  No, I don't.

11   Q.  Do you have a copy of that anywhere?

12   A.  It has been deleted since.

13   Q.  Well, then how do you know that it was posted in the

14   first place?

15   A.  Through talking to other agents that have viewed the

16   profile.

17   Q.  So other agents saw this, but didn't print it out or

18   didn't capture it in any way?

19   A.  I don't know if it's in our system or not.  I haven't.

20   Q.  So you don't know whether or not there is a piece of

21   paper, electronic or otherwise, that actually has this phone

22   number out there that is in the possession of the U.S.

23   Government right now; is that right?

24   A.  That document exists.  I don't know where it exactly is

25   in the database.

1    Q.  Okay.  But it wasn't -- you didn't deem it important

2    enough to attach to your affidavit to tie it to my client,

3    right?

4         (Pause.)

5    Q.  Correct?

6    A.  I don't know.

7    Q.  But it's not attached to your affidavit?

8    A.  It's not attached.

9    Q.  So you had it.  You could have attached it.  You chose

10   not to?

11   A.  Yes.

12   Q.  And instead we're just going to have to go on your

13   say-so that it exists, right?

14   A.  Yes.

15   Q.  And your say-so is that you talked to somebody else that

16   saw it?

17   A.  Yes.

18   Q.  And those other agents that have it, their names are

19   what?

20   A.  I don't know.  There are multiple agents on my squad

21   that have seen it.

22   Q.  So you can't identify the name of the agents that have

23   that tweet with Mr. Abdulkadir's phone number; is that

24   right?

25   A.  Like I mentioned before, there are a lot of agents on my

1    squad.  I have seen that document.  I just don't know where

2    it's filed.

3    Q.  I understand that, sir.  And there's a lot of people in

4    my law firm.  I don't know all their names either, but I do

5    some people's names.  And what I'm asking is:  Can you

6    identify one person that is in possession at the U.S.

7    Government anywhere of a tweet where that phone number that

8    would draw a link back to Mr. Abdulkadir exists?  Can you

9    give me one name?

10   A.  Yes.  Special Agent Jeffrey Moniz.

11   Q.  And anybody else?

12   A.  I don't know.

13   Q.  So Mr. Moniz is in possession of a tweet that has a

14   phone number that is linked back to Mr. Abdulkadir?

15   A.  Yes, a screen capture of that.

16   Q.  A screen capture.  Okay.  So now what we have, we have

17   two things that, if I understand this correctly, that you

18   say link these two tweets back to Mr. Abdulkadir.  Number

19   one is his picture next to the tweets and there's other

20   tweets in there with his picture, right?

21       (Pause.)

22   Q.  Is that right?

23   A.  Can you repeat the question, please?

24   Q.  Sure.  There's other tweets with his picture on his

25   Twitter page?

1    A.  Yeah.

2    Q.  And then number two would be this phone number that I'm

3    assuming is Mr. Abdulkadir's phone number; is that right?

4    A.  Yes.

5    Q.  Is there anything else that you have that links these

6    two tweets back to Mr. Abdulkadir?

7    A.  No, not to my knowledge.

8    Q.  How difficult is it for you to create a Twitter page?

9    A.  I don't know.

10   Q.  Have you ever had a Twitter account?

11   A.  I have a Twitter account.

12   Q.  You do?

13   A.  Yes.

14   Q.  So what did you do in order to sign up for that Twitter

15   account?

16   A.  Input your name and I can't remember what other

17   information that it was asking for.

18   Q.  Do you recall it was basically you give your name and an

19   e-mail address and then you're kind of done?

20   A.  That sounds right.

21   Q.  And could I, Chris Madel, walk out of this room today,

22   go back to my office and sign up a Twitter page and put in

23   Special Agent Vinetsky and put a picture up of you next to

24   it and start tweeting next to your picture, theoretically?

25   A.  Theoretically, yes.

```
1    Q.  Have people done that?

2    A.  Done what?  I'm sorry.

3    Q.  Have people spoofed other people on Twitter?

4    A.  I don't know.  I would assume so.

5    Q.  In fact, there's a whole industry set up around that.

6    Are you aware of that?

7    A.  I was not.

8    Q.  Now, on Twitter there's a place on the first page where

9    it says, "Following" and then there's a number right below

10   that, right?

11   A.  I don't know.

12           MR. MADEL:  Your Honor, may I approach?

13           THE COURT:  Sure.

14   BY MR. MADEL:

15   Q.  Showing you here what we'll call as Defense Exhibit 1,

16   this is that same Twitter page that you were talking about

17   with AUSA Docherty, isn't it?

18   A.  The name has been changed to Toakee Williams.

19   Q.  It wasn't Toakee Williams on December 9th?

20   A.  I can refer to the exhibit to double-check.  No, it was

21   still Khaalid Abdulkadir.

22   Q.  Do you see that right below where it says, "Toakee

23   Williams" it says, "@kabdulkadir14"?

24   A.  Yes.

25   Q.  And that matches the two offending tweets that you're
```

1    talking about here, right?

2    A.  Yes.

3    Q.  Do you see here where it says "Following" at the top and

4    it has the number 364?

5    A.  Yes.

6    Q.  What does that mean?

7    A.  What it means to me is that he is following 364

8    individuals.

9    Q.  And then right next to "Following" are "Followers" and

10   it says the number 147, right?

11   A.  Yes.

12   Q.  And followers are the persons that the Twitter

13   accountholder intends to send his or her tweet to, right?

14   A.  I would say that 147 people follow his account.

15   Q.  And the person tweeting doesn't intend to send it to

16   their followers?

17   A.  I can't speak to the intention of the individual.

18   Q.  So you don't know whether or not those were the people

19   that a Twitter person would send to versus somebody else?

20   A.  From my understanding, a tweet is public.

21   Q.  Understood.  So when somebody has 147 followers and they

22   tweet, does that show up on any other person's Twitter

23   account if they're not following that person?

24              THE COURT:  Can I interrupt for a quick question?

25              MR. MADEL:  Yes.

1          THE COURT:  Mr. Madel, I want to make sure the

2     record is clear.  I'm looking at some pages you've just

3     handed me.  Is this marked as an exhibit in some fashion?

4          MR. MADEL:  I just used it.  I thought the

5     government was going to use it, Your Honor, so I have not

6     premarked it.  If it's okay, I can mark it after the

7     hearing, but I would call it Defense Exhibit 1 and we would

8     offer it at this time.

9          THE COURT:  Okay.  Just so the record is clear,

10    that's what you've been asking this witness about --

11         MR. MADEL:  Yes.

12         THE COURT:  -- is what you are now calling

13    Defendant's Exhibit 1?

14         MR. MADEL:  Yes.

15         THE COURT:  Go ahead.

16         MR. MADEL:  Do you have any objection?

17         MR. DOCHERTY:  No.

18         THE COURT:  Are you offering it at this time?

19         MR. MADEL:  I just did.

20         THE COURT:  No objection?

21         MR. DOCHERTY:  No objection.

22         THE COURT:  Defendant's Exhibit 1 is received.

23    Next question.

24    BY MR. MADEL:

25    Q.  So with respect to those followers, do you know if any

1    tweet that somebody makes goes to somebody else's followers

2    if they're not following that account?

3    A.  I don't know.

4    Q.  What have you done to investigate whether or not any

5    employee or agent of the U.S. Government was Mr. -- this

6    account's -- a follower of this account on December 9, 2015?

7    A.  Can you repeat the question, please?

8    Q.  Sure.  What have you done to investigate whether any

9    agent of the U.S. Government was a follower of

10   @kabdulkadir14 on December 9, 2015?

11   A.  I don't know the answer to that question.

12   Q.  You don't know the answer to it or -- I asked what did

13   you do.  I didn't ask what somebody else did.

14   A.  Oh.  What did I do?

15   Q.  Yeah.

16   A.  I didn't do any of the things you just mentioned.

17   Q.  So you don't know any of Mr. -- or the followers here to

18   this kabdulkadir14 are?

19   A.  With respect to the 147 people that are following

20   Abdulkadir, no, I have not looked at the followers.

21   Q.  The screen shot in Government Exhibit 1 shows that it

22   was at 9:55 p.m.; is that right?

23   A.  On Government Exhibit 1?

24   Q.  Yes.

25   A.  Yes, correct.

1    Q.  And I know we have a dispute as to whose screen shot

2    this is, but you can see next to the first tweet there where

3    it says, "More brother get locked up," that one, do you see

4    where it says, "@kabdulkadir14" and then there's a little

5    space and it says, "20m."  What does that "20m" mean?

6    A.  Which exhibit are you referring to now, sir?

7    Q.  Government Exhibit 1.  Why don't I put it up on the

8    screen here.

9    A.  Okay.

10   Q.  Do you see it?

11   A.  Yes, I do.

12   Q.  Do you see where here it says, "20m," right there

13   (indicating)?

14   A.  Yes.

15   Q.  What does that mean?

16   A.  To me that means 20 minutes ago.

17   Q.  So it would be fair by looking at this, because we have

18   9:55 p.m., that that tweet was at 9:35 p.m., 20 minutes

19   before, right?

20   A.  Right.

21   Q.  And then this one is 22 minutes, so that would have been

22   at 9:33 p.m., right?

23   A.  Right.

24   Q.  Now, I noticed in your affidavit that you said that

25   these were removed; is that right?

1    A.  Yes.

2    Q.  Who removed them?

3    A.  I don't know.

4    Q.  When were they removed?

5    A.  I don't know.

6    Q.  Why were they removed?

7    A.  I don't know.

8    Q.  You were asked some questions about this picture, which

9    is Government Exhibit 2, and this was the picture, I believe

10   you testified, of the U.S. marshal outside of the Federal

11   Café downstairs, right?

12   A.  Yes.

13   Q.  Are you aware that before this group of young men was

14   videotaping the deputy U.S. marshal, that that same deputy

15   U.S. marshal was using his phone to videotape the group of

16   individuals?

17   A.  I was not aware of that.

18   Q.  Okay.  Did you ask the deputy U.S. marshal for any

19   videotape that he made of these individuals in the building

20   or outside?

21   A.  No, I have not asked him.

22   Q.  Is this the first time you're learning about it?

23   A.  About the picture or the --

24   Q.  The videotaping.

25   A.  Yes.

1   Q.  Now, with respect to the Miski testimony that you had,

2   you can see by -- well, strike that.

3           With respect to the kabdulkadir Twitter account,

4   when is the first tweet that you are aware that was made

5   from that account?

6   A.  The first tweet --

7   Q.  Yes.

8   A.  -- from that account?

9   Q.  Yes.

10  A.  I don't know.

11  Q.  And if you look at Defense Exhibit 1, the very last

12  page, page 6 of 6, there's a tweet there that says, "Blessed

13  everyday to have ya in my life," with two hands together

14  praying.  Do you see that?

15  A.  I do.

16  Q.  And that was sent from the kabdulkadir14 account on

17  December 1st, right?

18  A.  Yes.

19  Q.  And then you can see the most recent one was somebody

20  retweeted, "It's crazy how they love you after your

21  struggle, but not when you was going through it," and that

22  was on December 7th, right?

23  A.  Yeah.  It looks like then --

24  Q.  It was a retweet?

25  A.  Yes.

1    Q.  Now, if I understood you correctly, though, with respect

2    to the Miski communications, those occurred back in January

3    of 2015, so 11 months earlier?

4    A.  Yes.

5    Q.  So is it then your contention that there were no tweets

6    on this account, but somebody was using that Twitter account

7    to direct message in January of 2015?

8    A.  Can you repeat the question, please?

9    Q.  Sure.  I'm interested to know if the government knows

10   was somebody else using this account from January 2015

11   through December 1, 2015.  Do you have any activity other

12   than that direct messaging with Miski?

13   A.  I'm aware of search warrants being done on that Twitter

14   account.  I can't tell you the number of search warrants.

15   Q.  The communications, then, from the -- the person from

16   this account is saying that they want to go to Sham, which

17   you testified was Syria?

18   A.  Yes.

19   Q.  And then you testified that the person communicated

20   back, "Just get yourself to T."  You said it was Turkey,

21   right?

22   A.  That's what I take it to mean.

23   Q.  So you took "Just get yourself to T," you meant -- that

24   automatically to you meant Turkey?

25   A.  Yeah, in the context of the conversation.

1      MR. MADEL:  I have nothing further, Your Honor.

2      THE COURT:  Okay.  Thank you.  Any redirect,

3  Mr. Docherty?

4      MR. DOCHERTY:  Some, Your Honor.  Thank you.

5                   **REDIRECT EXAMINATION**

6  BY MR. DOCHERTY:

7  Q.  Agent Vinetsky, Mr. Madel was asking you a number of

8  questions concerning other people perhaps sending these

9  tweets.  I want to follow up on some of those.

10     Looking at Government Exhibit 1, which is up on

11 the screen now, looking at the boldface there, whose name is

12 in bold on Government Exhibit Number 1?

13 A.  Khalid Abdulkadir.

14 Q.  Whose photograph is on Government Exhibit Number 1?

15 A.  Khaalid Abdulkadir.

16 Q.  In direct do you remember me asking you about the

17 light-faced text on top, "Montana From OeO Retweeted"?

18 A.  Yes.

19 Q.  And you indicated -- correct me if I'm wrong -- that

20 that meant that this message had already been retweeted,

21 correct?

22 A.  Yes.

23 Q.  And after it had been retweeted once, it could have been

24 retweeted multiple times, correct?

25 A.  Correct.

1    Q.  The number of retweets does not have anything to do with

2    who has access to the original Twitter account; is that

3    accurate?

4    A.  That's accurate.

5    Q.  No connection between those two concepts at all, is

6    there?

7    A.  Not to my knowledge.

8    Q.  All right.  In terms of attributing this to Khaalid

9    Abdulkadir, besides his name and his photograph being on it,

10   you testified that his telephone number was sent out later

11   that evening from this account, correct?

12   A.  Yes.

13   Q.  And Special Agent Moniz has that screen capture at the

14   FBI Office, correct?

15   A.  Yes, Special Agent Moniz has the screen shot that was

16   provided to him through a confidential informant.

17   Q.  Now, on Thursday morning, the 10th, when you came into

18   work, was that the first time you heard about this?

19   A.  About the threatening tweet messages?

20   Q.  About the threatening tweet messages, yes.

21   A.  Yes.

22   Q.  And so fair to say that sometime during the night these

23   messages were taken down, correct?

24   A.  They were not there Thursday morning.

25   Q.  They had been there Wednesday night, they weren't there

1    Thursday morning; fair statement?

2    A.  Yes.

3    Q.  And also your understanding is that these tweets are

4    public, correct?

5    A.  Yes.

6    Q.  Okay.  Now, looking at the content of the tweets, which

7    we haven't talked a lot about, but number one, "More brother

8    get locked up the cops body they will find on the floor

9    body's dropping fast #kill them F B I and fuck as judge,"

10   did I read that accurately?

11   A.  Yes.

12   Q.  Fair to say that the person who wrote that has some

13   anger at law enforcement?

14   A.  Yes.

15   Q.  And the judicial system?

16   A.  Yes.

17   Q.  And who was it who was in touch with Mohamed Abdullahi

18   Hassan, a wanted terrorist suspect, back in January?

19   A.  Khaalid Abdulkadir.

20   Q.  Who was it that was in contact with Abdi Nur, also a

21   charged terrorist suspect from this district, in May?

22   A.  Khaalid Abdulkadir.

23   Q.  And when Khaalid Abdulkadir was arrested on the charge

24   that's got us in court here today -- you were shown Agent

25   Green's 302 during cross examination, correct?

1    A.  I was.

2    Q.  And does that 302, that report of Agent Green, indicate

3    that Mr. Khaalid Abdulkadir directed profanity at law

4    enforcement during his arrest?

5    A.  Yes.

6    Q.  Was noncompliant with agents' directions?

7    A.  Yes.

8    Q.  And was -- well, I don't have it in front of me, but was

9    verbally aggressive; would that be a fair characterization?

10   A.  That would be a fair characterization.

11   Q.  And so besides his name, his photograph, his telephone

12   number, and the content of the messages, anything else that

13   would attribute this to Khaalid Abdulkadir or are those four

14   things sufficient in your mind?

15   A.  They're sufficient.

16            MR. DOCHERTY:  I have nothing further, Your Honor.

17            THE COURT:  Before you sit down, Mr. Docherty,

18   just to be sure the record is clear, you mentioned two folks

19   who are -- in your questioning you said they are charged

20   with federal terrorism offenses.

21            MR. DOCHERTY:  Yes.

22            THE COURT:  I don't believe there's any evidence

23   in the record that you've presented that they are.  So does

24   this gentleman know that that you can make that as part of

25   the record or --

1          MR. DOCHERTY:  They are part of the record of this

2     court and I can direct the Court to the file numbers.

3          THE COURT:  Okay.

4          MR. DOCHERTY:  Mohamed Abdullahi Hassan is charged

5     with a number of other defendants in Criminal Case

6     No. 09-50.  I believe the judge's initials, it would still

7     be Judge Rosenbaum, but it would have been changed by now to

8     Judge Davis and at the time it was Magistrate Judge Susan

9     Richard Nelson and I don't believe a new magistrate has been

10    assigned.  That would be taken care of if he is ever brought

11    before the court.

12         The other one, Your Honor, was a complaint

13    charging Abdi Nur and Abdi Nur is charged by complaint.

14    When that case went to indictment, because he was not in the

15    district he was not included in the indictment, but the

16    indictment in which he is a co-conspirator is No. 15-49 and

17    the judge's initials are MJD/FLN.

18         THE COURT:  But there's a separate complaint that

19    predates the 15-49 indictment?

20         MR. DOCHERTY:  There is a separate complaint.  I

21    don't know that file number off the top of my head, but the

22    defendant's last name is Nur, N-u-r --

23         THE COURT:  Okay.

24         MR. DOCHERTY:  -- first name Abdi.

25         THE COURT:  All right.

1          MR. DOCHERTY:  And I would -- if it's necessary

2     for purposes of the record, I would respectfully ask the

3     Court to take judicial notice of its own records as to that

4     point.

5          THE COURT:  Okay.  Thank you.  You're excused.

6     Thank you for coming.

7          MR. MADEL:  Your Honor, can I just have a couple

8     more questions?

9          THE COURT:  Hold on.  Keep your seat.

10          Come back up because I had a question for you.  In

11     your questioning you mentioned that there was -- prior to

12     the photograph which is Government Exhibit 2, that the

13     deputy U.S. marshal who took that photograph had previously

14     been videotaping your client and the other gentlemen.

15          MR. MADEL:  Correct.

16          THE COURT:  But, again, there is no evidence in

17     the record that that happened.  It was just in your

18     question.  I want to make sure you're clear that the record

19     is --

20          MR. MADEL:  I am, Your Honor, and that's going to

21     be one of the things that we wanted to get this continuance

22     for.

23          THE COURT:  Okay.  Do you have some more questions

24     for this guy, though?

25          MR. MADEL:  I do, just quickly.

1            **RECROSS EXAMINATION**

2      BY MR. MADEL:

3      Q.  Mr. Vinetsky, I began by talking about how I'm sure

4      people butcher your name as they butcher my name, but one of

5      the things that I think you and I are both pretty good at is

6      that when we have to say our name over the phone, we have to

7      spell it, right?

8      A.  Yes.

9      Q.  And you've become pretty good at spelling your name, as

10     I have, right?

11     A.  Yes.

12     Q.  Now, you testified here that one of the reasons that you

13     connected this kabdulkadir14 account was because, as

14     Mr. Docherty asked you questions, it says, "khalid

15     abdulkadir," right?

16     A.  Yes.

17              THE COURT:  Just to be clear, Mr. Madel, you're

18     not on the screen.  Whatever you're pointing to -- I've got

19     Government Exhibit 1 is --

20              MR. DOCHERTY:  I've just undone the freeze.

21              THE COURT:  There you go.

22              MR. MADEL:  Thank you.

23     BY MR. MADEL:

24     Q.  The kabdulkadir14, one of the reasons you connected it

25     here is because it says, "khalid abdulkadir" on the account,

1    right?

2    A.  Yes.

3    Q.  And showing you here the criminal complaint in this

4    case, do you see here where the name khalid is k-h-a-l-i-d

5    on the Twitter account, but it's actually spelled with two

6    a's?

7    A.  Yes.

8    Q.  So whoever did that Twitter account misspelled

9    Mr. Abdulkadir's first name, correct?

10   A.  That's accurate.

11   Q.  Now, you were also asked some questions that whoever did

12   these tweets has some anger towards law enforcement and the

13   judicial system, right?

14   A.  Yes.

15   Q.  And there's nothing illegal about that, right?

16   A.  Correct.

17   Q.  In fact, there's a lot of attorneys that still have a

18   lot of anger towards law enforcement and the judicial

19   system, right?

20   A.  I would assume so.

21   Q.  And you also were asked some questions that

22   Mr. Abdulkadir used some profanity at the time that he was

23   being arrested?

24   A.  Yes.

25   Q.  Have you ever been arrested?

```
 1    A.  I have not.

 2    Q.  Do you think it's a stretch of the imagination for

 3    somebody to be upset if they're being arrested on something

 4    that they felt they were innocent of?

 5    A.  I don't know, sir.  I was never arrested.

 6    Q.  But is it a stretch of your imagination to think that?

 7    I mean, you were asked if the person here had some anger

 8    towards law enforcement.  You were able to answer that.  So

 9    are you able to answer the question that maybe somebody

10    that's innocent of a crime might be upset when they're being

11    arrested and somebody comes into their house throwing smoke

12    grenades in front of a little boy?

13    A.  Sir, I don't think my opinion matters on this issue.

14    Q.  But you do know that smoke grenades were thrown into

15    that house, right?

16    A.  I was not there.

17    Q.  You weren't there?

18    A.  No.

19    Q.  And do you know that there was a little boy that was

20    present when that search warrant was executed?

21    A.  I do not.

22         MR. DOCHERTY:  Your Honor, I object on the grounds

23    of relevance.

24         THE COURT:  Overruled.

25    BY MR. MADEL:
```

```
1    Q.  You're not aware of that either?

2    A.  I was not.

3    Q.  That might also give context to why Mr. Abdulkadir might

4    have been a little upset in the backyard with respect to

5    those agents; fair?

6    A.  If you say so.

7              MR. MADEL:  Thank you.

8              THE COURT:  All right.  Thank you.  You're

9    excused.

10             The government rests?

11             MR. DOCHERTY:  On the issue of probable cause, the

12   government rests.

13             THE COURT:  Okay.  And on the issue of detention,

14   you're relying upon the information set forth in the two

15   Pretrial Service reports we mentioned earlier?

16             MR. DOCHERTY:  I'm relying on that information and

17   I'm relying on the circumstances of this offense, the

18   content of the tweets, all of which go -- the totality of

19   the circumstances, all of which goes to threat to the

20   community and to the aspirations --

21             THE COURT:  Answer my question.

22             MR. DOCHERTY:  I'm sorry.

23             THE COURT:  Do you have any other evidence to

24   present?

25             MR. DOCHERTY:  Oh.  No.
```

1          THE COURT:  Okay.  Thank you.

2          MR. DOCHERTY:  Sorry.

3          THE COURT:  That's okay.

4          Mr. Madel, first of all, I forgot to rule on your

5     request that this whole thing be put off to the South Dakota

6     judges.  And that request is denied.  If it hasn't been

7     obvious until now, I am proceeding.  And I don't read Judge

8     Riley's order as recusing all of the judges in the district,

9     but simply for reasons of the interest of justice

10    reassigning the whole matter to those judges after this

11    detention hearing and preliminary hearing is complete.

12         With that, do you have any evidence you want to

13    present today?

14         MR. MADEL:  No, Your Honor.

15         THE COURT:  All right.  So what do you want to

16    present and when do you want to present it?

17         MR. MADEL:  Well, can I be heard with respect to

18    probable cause?  Because what I'm hoping is that if we hear

19    that, it's not necessary to have a detention hearing.

20         THE COURT:  Okay.  So you're prepared to argue

21    probable cause?

22         MR. MADEL:  Correct.

23         THE COURT:  Okay.  Go ahead.

24         MR. MADEL:  The only charge that my client has

25    been alleged to have violated is 18 U.S.C. 115(a)(1)(B).

1    That section states, "Whoever threatens to assault, kidnap,

2    murder a United States official, a United States judge, a

3    federal law enforcement officer, or an official whose

4    killing could be a crime under such section with the intent

5    to impede, intimidate, or interfere with such official,

6    judge, or law enforcement officer while engaged in the

7    performance of official duties or with the intent to

8    retaliate against such official, judge, or law enforcement

9    officer on account of the performance of official duties

10   shall be punished as provided in subsection (b)."

11          There's two things that are especially relevant

12   there, Your Honor.  It says "such official" twice.  This was

13   a matter that, Your Honor, we brought up in the United

14   States vs. Said case where -- and I know that we had a

15   disagreement with Your Honor with respect to that motion to

16   dismiss the indictment.  That motion, however, and the bill

17   of particulars was ultimately granted by Judge Piersol in

18   that case in the order filed on September 3, 2015,

19   Document 67, where he said, "That the motion to dismiss the

20   indictment or for a bill of particulars, Doc. 20, is granted

21   to the extent that as to Count 1" -- and that was 18 U.S.C.

22   115 -- "the government shall file a bill of particulars

23   stating who was allegedly threatened, how that person was

24   allegedly threatened, and what was stated that allegedly

25   constitutes a threat."

1              There is nothing illegal for a person to say, and

2      pardon me for using these words, Your Honor, but fuck the

3      FBI and fuck the U.S. government.  There's a lot of my

4      friends that feel that every day.  That is not illegal.

5              And the agent just testified he cannot identify

6      one specific person that was threatened under 115.  That's

7      dispositive.  If you can't say it -- it says, "such

8      official."  If those words are to be given meaning in

9      115(a)(1)(B), then you have to identify -- as Judge Piersol

10     said, you have to say who it was.

11             In that case there was a disagreement over whether

12     or not it was the Attorney General or the U.S. Attorney.  He

13     said you've got to say who it was.  You have to say if it's

14     the U.S. Attorney General or the U.S. Attorney.  The same

15     thing is true here and they can't do it.

16             The idea of what he did here, assuming that he

17     made these tweets, is protected First Amendment speech by

18     saying screw them all.  He did not specifically threaten

19     anybody and there's no allegation of a person that he

20     allegedly threatened.

21             Furthermore, there's nothing in this record

22     whatsoever that this was done as part of an intent to

23     retaliate for the performance of official duties.  It's fine

24     under this section to say I hate you, I wish you were dead

25     as long as it doesn't have a connection to trying to get

1    you.  And right here there's been no evidence whatsoever

2    that this was communicated even to the federal government,

3    let alone if any government official was one of his

4    followers.

5         There is zero in this record on this and for that

6    reason I would respectfully request that a probable cause

7    determination be made lacking and we don't need to proceed

8    to a detention hearing under Judge Piersol's -- under his

9    ruling.

10         THE COURT:  Okay.  Mr. Docherty.

11         MR. DOCHERTY:  That argument is deficient and

12    what's deficient about it is he didn't say screw them.  He

13    didn't say that he disagreed with them.  He said in tweet

14    number one, "kill them F B I and," profanity, "judge."  And

15    in tweet number two --

16         THE COURT:  Hold on.  I want to try and understand

17    that one because technically it says, "fuck as judge."

18         MR. DOCHERTY:  Yes.

19         THE COURT:  F-u-c-k, new word a-s, new word

20    j-u-d-g-e.  So is that -- are we interpreting that to be a

21    misspelling of the word "ass," so it's fuck ass judge, or

22    fuck as judge?  I don't know what that means.

23         MR. DOCHERTY:  You know, that's the sort of

24    sophisticated legal question that -- I'm taking it as a

25    misspelling, yes.

1          THE COURT:  Okay.

2          MR. DOCHERTY:  But it says, "kill them F B I" and

3    then in the next tweet it says, "I'm kill them FEDS."  This

4    isn't First Amendment protected.

5          THE COURT:  Who is F.B.?  Do we know that?  We've

6    got also "Fuck them F.B."

7          MR. DOCHERTY:  Right.

8          THE COURT:  Oh, I see.  "F.B.I I'm kill them

9    FEDS."

10         MR. DOCHERTY:  Yes.  There's two I's there, but

11   the period is in the wrong place.

12         THE COURT:  Okay.

13         MR. DOCHERTY:  There are threats to kill here and,

14   yes, it is tied to the performance of official duties by

15   line 1 of tweet one, "more brother get locked up," and then

16   it goes on from there, "the cops body they will find on the

17   floor."

18         As to the specificity of the threat, I was not

19   involved in the Said case.  However, I know that the

20   argument there was what category of person is being talked

21   about, is it the U.S. Attorney, is it the Attorney General.

22         It is not necessary -- and if the Court wants, I'd

23   be happy to submit a short memo on this point, but it is not

24   necessary to identify by name, rank, and serial number a

25   specific person.  What is necessary is that the threat be

1    directed at a person within the scope of the statute,

2    18 U.S.C. 115, which includes both federal law enforcement

3    officers, which certainly includes the FBI, and federal

4    judges.  Both of those types of people, those categories of

5    people, are spelled out in the statute.

6         The complaint alleges threats to kill federal law

7    enforcement officers, threats to kill a judge.  It alleges

8    the specific intent was done either to interfere with the

9    performance of official duties or to retaliate for the

10   performance of official duties.

11        This complaint is sufficient on its face, probable

12   cause is established on the record, and I would respectfully

13   ask the Court to so rule.  Thank you.

14        THE COURT:  Okay.  Anything else you want to tell

15   me, Mr. Madel?

16        MR. MADEL:  Yes, Your Honor.  Lacking in the

17   government's argument was the language of the statute.  The

18   statute says "a United States official," not en masse, not

19   an agency of the government.  It says an official and then

20   it says -- and then it goes down to law enforcement officer,

21   U.S. judge, or an official whose killing would be a crime

22   under such section with the intent to impede, intimidate, or

23   interfere with such official, not an agency.

24        Congress knows how to say an agency or a bureau.

25   And the threat, if one was made by my client, was to a

1    bureau.  And it was feds, which is even broader than one

2    bureau.  This statute which he is alleged to have violated

3    talks about a person.  The government's argument said

4    nothing, nothing about the statute.

5           THE COURT:  Okay.  Just to be clear, the standard

6    at the preliminary hearing stage is whether there's probable

7    cause to believe the defendant has committed the offense

8    that's alleged in the complaint.

9           And based upon the testimony of the special agent,

10   it appears to me that there is probable cause to believe the

11   defendant, Khaalid Abdulkadir, has committed the offense

12   that's alleged in the complaint, which is a violation of

13   Title 18, United States Code, 115(a)(1)(B) and (b)(4), which

14   is -- (b)(4) is just the punishment section, correct?

15          MR. DOCHERTY:  Correct, Your Honor.

16          THE COURT:  And therefore I will order that the

17   matter be referred to the grand jury for further

18   proceedings.

19          In terms of detention, just to be clear, I'm not

20   viewing this as two different hearings.  This is a

21   preliminary hearing/detention hearing.  The evidence that

22   has been presented, while I've ruled on the probable cause

23   piece, is also part of the evidence to be considered on the

24   issue of whether the defendant should be released or

25   detained under Section 3142.

1              And it's my understanding that, Mr. Madel, you

2    have some additional evidence that you wish to present, but

3    that you are not prepared at this time to do that, correct?

4              MR. MADEL:  Correct.

5              THE COURT:  So tell me what it is you want to

6    present and we'll figure out what to do next.

7              MR. MADEL:  Well, what we want to present -- and,

8    again, I first spoke to my client today, so I'm aware from

9    just whispering to my client just as he came in here that

10   some of these witnesses are in the courtroom.

11             And if it pleases the Court, I would like not to

12   reveal too much of my work product with respect to that, but

13   there are some family members that I believe that are going

14   to be relevant and then we are going to do our best in order

15   to try to get some of these people that saw the marshal.

16   And then also the defendant right now is going to college

17   and I wanted to be able to demonstrate that as well to the

18   Court, that he's going to school.

19             And so those witnesses, I'm thinking that all this

20   could be done in probably two to three hours.  I don't think

21   it would go much beyond that assuming normal cross

22   examination from the government.

23             THE COURT:  Bear with me one moment.

24        (Discussion off the record between

25         the Court and the courtroom deputy.)

1          THE COURT:  All right.  So here's what we're going

2     to do.  We will continue this hearing to Monday,

3     December 21st at 2:00 p.m.  Oh, you know what, I haven't

4     checked, though -- Ms. Marshal, can I see you for a moment,

5     please.

6          (Discussion off the record between

7            the Court and Marshal Lubinski.)

8          THE COURT:  Okay.  So we're going to continue this

9     to Monday, December 21st at 2:00 p.m. and I can't tell you

10    where it's going to be.  It may be back in this courtroom.

11    It may be down on the 9th floor in my courtroom or some

12    other courtroom.

13          The purpose of the conversation with the Marshal

14    was to determine if given what we know here today, looking

15    at the size of the folks who are interested in being here,

16    finding a place that will accommodate the same quantity of

17    people.

18          So on Monday morning contact my office, Mr. Madel

19    and Mr. Docherty, and we'll tell you where we're going to

20    be.  I just don't know right now whether this courtroom is

21    available because it's Judge Tunheim's general work space

22    and I don't know what he has scheduled at that date and

23    time.

24          Anything else from the government?

25          MR. DOCHERTY:  No, Your Honor.  Thank you.

1          THE COURT:   Anything else for the defendant?

2          MR. MADEL:   Nothing, Your Honor.  Thank you.

3          THE COURT:   So I found there is probable cause.

4    The matter is referred to the grand jury.  The question of

5    detention is still an open item and this hearing is

6    continued for further proceedings on Monday, December 21st

7    at 2:00 p.m.  The defendant will be remanded to the custody

8    of the Marshal pending the continued hearing on Monday.

9          We are in recess.

10        (Court adjourned at 4:18 p.m.)

11                              *       *       *

12

13

14

15        I, Lori A. Simpson, certify that the foregoing is a

16   correct transcript from the record of proceedings in the

17   above-entitled matter.

18

19              Certified by:   *s/ Lori A. Simpson*

20                              Lori A. Simpson, RMR-CRR

21

22

23

24

25